May it please the Court, I've reserved four minutes of rebuttal time. This case demonstrates that the trial court erred in granting summary judgment as to three of four of plaintiff's claims for relief and failed to correct its errors despite substantial evidence in the record at subsequent stages proving plaintiff's entitlement to judgment on those three of four claims for relief. The time frame of events and the specific facts of this case demonstrate some of the most sophisticated and cunning acquisition professionals using unfair and deceptive trade practices and tortiously manipulating a less experienced seller at all stages of an acquisition. From the beginning of due diligence through and including resolution before the courts including a recent decision before the Eastern District of Pennsylvania, North Carolina recognizes that sophisticated parties are capable of sophisticated torts that oftentimes are difficult to identify without knowing all the relevant facts. North Carolina Supreme Court has specifically said that the more skillful and cunning the accused, the less plainly defined are the badges which usually denote fraud. The trial court's numerous decisions in this case prior to trial and during trial which limited the issues at trial to a very unfairly prejudiced the plaintiff in this action and prevented the jury from rendering a more comprehensive verdict that eventually bore out in terms from facts demonstrating the unfair and deceptive trade practices of the defendants. Since my time is limited, I'd like to focus on three types of conduct, unfair and deceptive conduct exhibited by these facts. The first is the use of by Supply One of fraud and detrimental reliance to create unfair bargaining leverage and eventually forcing the plaintiffs to sign an onerous asset purchase agreement, many of the terms of which were never discussed between the parties and for which there was no consideration. Okay, Mr. Rogers, because of all the different causes of action and theories here, could you tell us which ones you're referring to with regard to this evidence? Your Honor, with regard to the first set of evidence, the evidence supports elements of each one of the unjust enrichment claim as well as the fraud and the unfair and deceptive trade practices claim. For ease of argument, I think I'll focus on the unfair and deceptive trade practices claim because the standard for the unfair and deceptive trade practice claim does not require intent. Good motives under North Carolina law are not sufficient to rebut an unfair and deceptive trade practice, and if certain facts are established in the court as a matter of law, it's to deem and determine that the conduct would be an unfair and deceptive trade practice. So I'll focus on those elements. In a guiding principle of North Carolina law, in particular as we're talking about negotiations between parties to a potential contract, is that even when there is no duty to disclose, if one does speak, then he must make a full and fair disclosure of the matters he discloses. This duty arises in the context of buyers and sellers of businesses. In the case of Kindred v. Bond of the North Carolina Court of Appeals that cited in brief establishes that. There are three discrete times that Supply One had a duty prior to the signing of the asset purchase agreement to disclose its true intentions to Mr. Wetmore. The first time was at the time of the signing of the contract for more than five months prior to presenting Mr. Wetmore with a letter of intent that Supply One performed due diligence and Mr. Wetmore provided all the information that was requested of him. Only when Mr. Wetmore disclosed that he had another offer to buy his business did Supply One provide him with that letter of intent. Now Supply One in the course of the trial and in pretrial discovery admitted that they wanted Mr. Wetmore to believe that they would close in accordance with that letter of intent and that Mr. Wetmore did in fact believe he would Supply One would close in accordance with that letter of intent. Now although the letter of intent was generally non-binding and contained that language, there were certain provisions which were clear and unequivocal promises by Supply One at the time of signing. There are four of those. One, Supply One committed to immediately commence due diligence, further due diligence. Two, that there would only be limited negotiations thereafter as such negotiations would relate to representations and warranties. Three, that Supply One would immediately commence preparing a more definitive asset purchase agreement. And four, that Supply One would not be responsible for any liabilities relating to triads supply arrangements with a business called Pinnacle. And your position is that Supply One didn't comply with those provisions? That's correct. Why isn't that a simple breach of the letter of intent? Your Honor, the effect of that as well as the post letter of intent conduct demonstrate that it was Supply One's intent not to actually perform in accordance with those. Well you haven't alleged fraud in the inducement, have you? Yes, Your Honor. That is one of the claims that we alleged. With respect to the letter of intent? Yes, Your Honor. The the allegations include that... I don't remember seeing anything in the complaint about a fraud claim or a letter of intent. Your Honor, the breach of contract claim or the claims with respect to letter of intent, they vary in two regards from a breach of contract claim. Because North Carolina says that if you have a contract that says by its terms such as a letter of intent that it's non-binding, then the claim for relief must be brought under not a contract claim for relief but rather a detrimental reliance claim and that's what we claim or an unjust enrichment theory for relief. The other theory that we raise is that according to fraud, which again both of these under these particular circumstances would violate Chapter 75, but those theories establish that Supply One... Either Supply One made a commitment or a binding obligation or it didn't. Which one is it? Your Honor, because there's a written contract we can't claim or there's a written letter of intent that says it's non-binding, we can't make a claim under contract. Well, I mean if you're conceding it's non-binding, then how could it possibly be that they committed to do what they said they weren't agreeing to? There are two elements for Your Honor to consider. First of all, the letter of intent actually says portions of it are binding and other portions are not. Okay, so then you can sue on those portions that are binding. The second is that the post letter of intent conduct intentionally created a dependency relationship that Supply One's executive who negotiated it said his intent was to create desperation by Mr. Wetmore so that he could cause further terms to be negotiated, further terms that were favorable to Supply One and that would hurt Mr. Wetmore. In this case, the example is an unconditional pre-closing indemnification provision. And the strategy was to not comply with the letter of intent even though Supply One knew and Supply One had made promises to Mr. Wetmore they would close in accordance with the letter of intent to make him dependent. And I'll turn to Your Honor. Excuse me. In responding to Judge Diaz, I would appreciate it if you would explain to me what the impact of the integration clause in the asset purchase agreement has on your argument regarding the letter of intent. Because as I read it, the integration clause provides that the asset purchase agreement supersedes all prior agreements and understandings. And I believe with regard to the contract claims for relief that assuming that formation defenses which were not permitted by the district court and there was no evidence nor were they submitted to the jury, that assuming that those contract formation defenses are not applicable, then the integration clause only pertains to the breach of contract claims. As cited in brief, one of the issues is Supply One presented a contract that didn't have a release or a waiver of liability arising prior to those agreements. And we again assuming that there are no formation defenses, which we requested that the district court submit to the jury and permit evidence regarding, and we were denied, that under those circumstances the integration clause may bind the parties with regard to the breach of contract claims and supersede all prior contracts. But it doesn't release Supply One with regard to liability for the fraud and the detrimental reliance and the unfair and deceptive trade practices occurring prior to the signing of that asset purchase agreement. So what you're really doing, it seems to me, is you're trying to turn the violations of the letter and its intent into torts because you don't have a contractual remedy. And what you're doing then is really creating these torts when the real guts of the party's claim is the breach of contract. Your Honor, in the modern context where a buyer that's very sophisticated in acquisitions creates a dependency relationship that excludes other potential purchasers and then forces onerous terms of an asset purchase agreement on a seller who has no other options at that point, I believe that our law does recognize torts. It may, but that's not the circumstance here, is it? You are dealing with two corporate entities and at any time after the letter of intent, Triad was perfectly free to walk away. I don't believe that's true, Your Honor, in particular given the representations that Mr. Laughlin continued to make to Triad, including verbal representations that we cite. You don't think what is true? That Triad could have walked away, Mr. Wetmore could have walked away at any time? Not based on the promises. Well that's factually, I mean that has to proceed from an assumption that somehow the letter of intent created obligations which you have acknowledged that it didn't. Your Honor, the letter of intent created certain obligations which after that oral promises made Mr. Wetmore believe were going to be fulfilled and I'll quote Mr. Laughlin from page 3809 of the joint appendix. Quote, I believe Mr. Wetmore believed that we would close the deal. I believe it is reasonable for him to have expected at that point, at that point in time, the letter of intent would be the deal. And the issue is from the signing of that letter of intent up until and through the asset purchase agreement was signed, did they make additional promises? And in this case, the record is clear that they did. And Your Honor, we cite the North Carolina Supreme Court case of Williams versus Jones from 1988 that those verbal promises to close in accordance with the terms of the letter of intent converted what was otherwise a non-binding letter of intent into a contract that Mr. Wetmore reasonably relied upon and detrimentally relied upon in order to close. But that understanding was specifically, expressly superseded by the integration clause in the asset purchase agreement. All prior agreement or understandings. Your Honor, again respectfully, that assumes that there weren't any formation defenses and that there was consideration for things like the the integration clause which this particular fact pattern establishes there weren't. And that this particular fact pattern discloses that even 15 days after Supply One promised all of Triad Packaging's would close on September 15th, they presented an asset purchase agreement with terms were never discussed. Mr. Wetmore attempted to remove those from the asset purchase agreement and Supply One told him that they would not do it. And I don't know if you answered Judge Duncan's question. What prevented your client then from walking away from that? Two issues. Number one, at that point in time, the declines in his business and the damages from detrimental reliance were such that he was on the verge of bankruptcy. The second issue, Your Honor, as we all know, this was at the time in our in August and September 2008 when there were no other real options. And his business had declined to a point based on Supply One's conduct, which is detailed in the brief in the record, that he wasn't able to recover. His only feasible option at that point was to sign that agreement and take what little that he could to pay off his debts and move on. Now, Your Honor, I would like to make one point that is not clearly identified in the briefs before I sit down. And that is that Supply One's conduct didn't just end there. And as we did identify in the briefs, that after the jury verdict in this case, Supply One filed a second action seeking to enforce a clause under North Carolina law which is not enforceable. And that is an indemnification clause seeking attorney's fees in the Eastern District of Pennsylvania. The Eastern District of Pennsylvania determined that Supply One pursuing that action was barred by res judicata grounds. The Eastern District of Pennsylvania said it appears that the reason Supply One did this was in an attempt to avoid North Carolina law because of the result, which would be that North Carolina law clearly would invalidate the indemnification clause. The reason why I raise this in particular is it demonstrates the kind of heavy-handed, inequitable assertions of power that North Carolina law prohibits. Supply One in its briefings for the Eastern District of Pennsylvania established that they spent $624,000 in attorney's fees fighting this matter before the North Carolina courts. Now, Mr. Wetmore is a party that his primary source of income was taken away by Supply One's conduct. They refused to after that conduct, took his primary source of income away, and he didn't, he had limited means in which to fight. Now, we submitted an affidavit before the North Carolina, before Judge Voorhees in Statesville, establishing that Mr. Wetmore spent approximately $180,000 in legal fees pursuing these claims. Less, approximately three and a half times less than Supply One spent. Now, North Carolina's unfair and deceptive trade practices statute, as defined by the 1980 case of, sorry, the 1980 Johnson v. Phoenix insurance case, establishes that this kind of misuse of the legal system to draw someone into an inconvenient forum and to use the legal system to... Rogers, when you filed your complaint in this case, none of that had happened. What's the point of this? Your Honor, the claims that they pursued were pursuant to Section 10 of the Asset Purchase Agreement, and the Eastern District of Pennsylvania determined that that was and should have been brought in the North Carolina action. Well, I understand that, but my point is, at the time you filed the complaint, and at the time that Judge Voorhees dismissed your UDTPA claim, none of that had happened. To respond to your Honor, we filed Rules 50, 54, and 59 motions that reflected those claims made by Triad PAC, or made by Supply One, as well as motions to amend the complaint to comport with the evidence that was presented at trial, in order to reflect those claims that should have been brought, and that the record at that point clearly established were relevant to the case law that defines North Carolina's Chapter 75. Thank you very much. You have a few minutes for rebuttal. Mr. Kingston, on your, as appellee. Thank you, Judge. May it please the Court, my name is John Kingston. I'm here on to talk about the Badges of Fraud and Deceptive Conduct. I think it might be useful to talk about what those badges of fraud and deceptive conduct were that were alleged. The only badge of fraud that has been alleged in this lawsuit was a misleading statement that Mr. Wetmore alleged was made by Supply One. That misleading statement, that according to Mr. Wetmore, induced him to sign the Asset Purchase Agreement on Supply One's statement in the Letter of Intent in April of 2008, that the deal would close in July of 2008. Mr. Wetmore was asked that question specifically. It is available in the record at page 245 and 46 of the Joint Appendix, and it's quoted on page 16 of the Joint Appendix. Obviously, in October of 2008, one cannot sign a document in reliance on the belief that one would be signing that document in July of 2008. In fact, the Letter of Intent contemplated that the deal would not close on July 2008 and described what the parties would do if the deal did not close in July of 2008. It was modified, wasn't it, to extend through September? Yes, Your Honor, it was modified to extend up through September 25th, and I don't have the modification in front of me, Judge, but I think that there was an indemnification provision, but that was only for the cost of due diligence. And I think it was capped, and my recollection is that it didn't come into play. But to the extent that Mr. Rogers has argued, but for this Letter of Intent, his client would have sold his assets for $3.5 million instead of the $3.0 million purchase price that actually ended up being in the asset purchase agreement. That could have been done at any time. He could have done that on October 7th. He could have done that on a minute before executing the agreement, which he executed sitting next to Mr. Rogers. And this was, as was established in the record at trial, Mr. Wetmore's fifth involvement as either a purchaser or a seller of a company, of the assets of a company. So the notion that Mr. Wetmore was a lamb in the woods, we think, is incorrect. Judge Duncan, you asked Mr. Wetmore, excuse me, you asked Mr. Rogers whether or not Mr. Wetmore could just walk away from the Letter of Intent. And the answer is that, yes, he could. And that wasn't just because the Letter of Intent was, by its express terms, non-binding. There is actually a termination without cause provision, and that's at page 91 of the Joint Appendix, which includes the Letter of Intent. Mr. Rogers spent some time talking about a dependency relationship that Supply One created with Mr. Wetmore. Supply One is a manufacturer and distributor of boxes, including corrugated boxes. At no time before the asset purchase agreement was executed on October 8, 2008, was Supply One a supplier of Mr. Wetmore, and at no time before it was executed was Supply One a customer of Mr. Wetmore. There was nothing that Supply One could do to make Mr. Wetmore dependent upon it, other than buy his company if he was willing to sell it. Indeed, to the extent that Mr. Rogers has suggested to the Court that Mr. Wetmore somehow changed his business practices in reliance on the notion that Supply One was going to buy his company, Section 4.25 of the Asset Purchase Agreement is a warranty section in which Mr. Wetmore specifically warrants that he won't change his ordinary business practices and hasn't since December of 2007. So we would respectfully submit that the notion of some kind of a dependency relationship being created is not accurate. As far as the District Court's judgment of summary judgment on the fraud and unfair deceptive trade practices claims, we think those were correct because, as we've said, the only misstatement that they've identified is this statement that the October 8, 2008, Asset Purchase Agreement would defy the laws of time, as I understand them, and be executed in July of 2008. With respect to the quasi-contract unjust enrichment claim, we think that's easily disposed of because the parties went to trial on an express contract. So I don't think that there's, I won't burden the Court with a lot of time on that issue. I would like to talk a little bit about Supply One's cross-appeal. Do you want to do that now? You have some time reserved after rebuttal on the appeal. I'm happy to do it now if it's convenient for the Court. I'm cautiously optimistic that I won't use the full five minutes on rebuttal. I don't think that I need more than two minutes to make my points on our cross-appeal, but I'm happy to defer to the Court, whatever's easiest. Why don't you wait and make them after the argument, after Mr. Rogers comes back? I'm happy to, Judge. Thank you. Thank you. Your Honor, acquisitions of a business follow a pattern that sophisticated acquisition professionals understand. Supply One created a dependency relationship that intended to make Mr. Wetmore desperate so that he would agree and was forced to to any terms that Supply One proposed at the last minute. Mr. Laughlin's deposition, the testimony found on page 3803 of the Joint Appendix, references an email Mr. Laughlin wrote in June of 2003 that said, that proves those points specifically. It says, quote, at this point he is not, in my opinion, sufficiently desperate to give us such an indemnity, but he may be within a month or two if threatened to walk away. That is the kind of dynamic that exists in these relationships. They knew it, they'd done it before, and they did it to Mr. Wetmore. This particular instance was even more egregious because in August of 2008, after the market knew that Supply One was buying Mr. Wetmore's business and the market had started sending business to others due to uncertainties of whether Triad would be able to supply, what the effect of the purchase would be, Supply One's CEO came to Triad Packaging, and similar to the facts of the case of Jordan versus Earthgrains from out of North Carolina that's cited in the brief, this CEO said, we're going to close in accordance with this deal that we have with Mr. Wetmore by September 15th. That made it unconditional under those circumstances that the terms of the letter of intent should have been governed, and at that point Mr. Wetmore was completely dependent on Supply One closing. Now, I read to your honor the quote from Mr. Laughlin saying that it was reasonable for Mr. Wetmore to believe at that point that Supply One would close in accordance with the letter of intent. That testimony occurs after a discussion about this dependency. Under the circumstances, Supply One led Mr. Wetmore down the primrose path when he didn't have any other options, they decided to negotiate a better deal, and they did. Under North Carolina's Unfair and Deceptive Trade Practices Act, those representations intending to change them at a later time amount to unfair and deceptive trade practices. I'd like to reserve one minute if I can to respond to Mr. Kingston's cross-appeal. Mr. Kingston? Thank you, Judge. Supply One's cross-appeal is under Rule 50 of the Federal Rules of Civil Procedure, and we contend that there was not legally sufficient evidence for the jury's $211,000 damage award for the... Well, it wasn't just $211,000, it was $211,363, which is a very precise figure. Yes, your honor. It sounds like it was derived from somewhere in the record. Do you have any idea, I guess your position is, it ain't to be found in the record, right? That's exactly right, Judge, and the way that I think a useful comparison would be to compare... But I guess my concern is it doesn't seem like a number that was, you know, pulled out of a hat or fell out of thin air. It sounds like a number that someone calculated. It is a very precise number, you're right, Judge. The problem for the plaintiff is that there is not a number that supports that number. Well, you know, Mr. Kingston, what I'm worried about in this case is that it, and tinkering with the jury's verdict, is that, and I think that Judge Voorhees was concerned with too, you have a specific finding by the jury that Supply One breached its covenant of good faith and fair dealing, and essentially that's a contractual penalty for misconduct. That's not something you can point to in the record the way you can point to they didn't supply, they didn't give us information, or they didn't give us whatever else that they were required to do. So we have this element that's part of their damages that really isn't susceptible to identification on a page of the record, and it looks to me like what the jury did, leaving the equal damages to both sides. Give it a wash, go home. And I think that that really is what concerns Judge Voorhees. Tell us why that is wrong. If that's what the jury did, Your Honor, then that ran contrary to Judge Voorhees' express instruction that they should not consider offset. That offset would be something for the judge. The jury is to award damages that they perceive are flowing from the breach of contract. Right, but I think there isn't a fair reading of this verdict, the fact that that the jury found both sides at fault. I mean, you have to say that. I think there could be a fair reading of the verdict, Your Honor, that the jury certainly wanted to award something to Mr. Wedmore. Right. Now, how would a party prove damages of breach of good faith and fair dealing from your perspective? How would that be proved and the record to a quantifiable amount? The party would identify testimony or a document that would speak to both the judge's instruction and the standard that Mr. Rogers articulated as far as what damages are. It would need to be something that would explain how their position would have been, something that would show how the position that Mr. Wedmore had occupied, but for that breach of the implied covenant of good faith and fair dealing, would have been economically superior to the position he otherwise occupied. Part of the problem is that the jury did find an identifiable amount. That's what I found strange, and I simply couldn't trace it back to anything. In the district court's explanation, it is conceivable that the contractual award in favor of evidence that was not specifically identified in special interrogatory submitted on the verdict form is singularly unhelpful. I think that that's right, Your Honor. I think that there are two elements to award damages in a breach of contract claim. One element is breach, but then a discrete element that has to be proved separately is damages. And there are, as we've said, there's no evidence of damages here. And the way to demonstrate that's wrong, we're not saying that the jury has to comb through the record and identify specific documents or specific testimony, but certainly to say that the evidence is legally sufficient, there has to be something that's identified. Legally sufficient must mean something greater than zero. Some loss, some actual loss. Yes, Your Honor. Not a penalty, because you don't award penalty damages for a breach of contract. That's exactly right, Your Honor. And there's just simply no evidence, there has been no testimony, no paper that suggests that for those three technical breaches that were identified, and then this breach of the implied covenant of good faith and fair dealing, that had those not occurred, Mr. Wetmore's position would have been economically superior. You're saying that would have required expert testimony then? I don't know, my time is up, I'd like to answer your question if I could. Please go ahead. I don't know that it would have required expert testimony. I think if Mr. Wetmore had said something along the lines of, I don't know how they hurt me, but they hurt me by treating me as an example, what if the evidence had said, had shown, that they received a competing offer due to Supply One's failure to provide the information in a timely manner, that a year later they received, let's say, an offer that was only half what the original contract offer was. Would that be an example of there wasn't as much value in the corporation due to the economic conditions? I mean, what would be an example? I guess I'm struggling. An example flowing from the breach of the implied covenant of good faith that they could have articulated? That they couldn't get any other customers in the marketplace for that amount? An example would have been, Mr. Wetmore claims at trial that he's working hard to uphold his end of the bargain. He goes out and he's hustling to get customers for Supply One. In doing so, he spends $10,000 of his own money taking people out to fancy dinners and that kind of thing. Had Mr. Rogers obtained that kind of testimony from Mr. Wetmore at trial, I would probably be up here telling you that that's no good, but it would be something more than zero. It would be, it appeared to me, and obviously this is not your responsibility to come up with sufficient evidence, but the jury found, the breaches that they found, failure to provide the CDBS within 60 days of closing, the tax forms within 90 days of closing, and access to other financial records post-closing, and breaching the implied covenant of good faith and fair dealing, would have had to generate some sort of explanation of the damages incurred, as opposed to the fact that Supply One was just a bad act. I think that that's right, Judge, and we didn't see it, Mr. Wetmore didn't testify about any, and his lawyer didn't argue regarding any such damages in closing, and I know the closing argument isn't evidence, but there was nothing even, the reason we're all struggling to find something to pin that very precise number on is because it's just not there on the record. I think we understand your point. I thank you for your time, Judge. Thank you, and Mr. Rogers, you have the minute that I promised. Your Honor, the, your Honor's statements with regard to the closing date balance sheet demonstrate the nature of the breaches and the sophistication of Supply One. That's not, but that's not my issue. My issue is, and even the district court couldn't figure out where that amount came from, and how, how that specific amount was related to failure to provide tax information. Your Honor, it's the closing date balance sheet that creates any ambiguity or any inability to define with mathematical certainty, Mr. Wetmore's damages. I'm not talking about mathematical certainty, I'm just talking about at all. I mean, you have several fairly sophisticated people, including Judge Voorhees, trying to figure this out. And your Honor, that is one reason why we quote and rely heavily upon the prior uncured breach principle of North Carolina law that says that they breached the asset purchase agreement in a way that they know makes mathematical determinations or precisely defining damages extremely difficult. Well, not define with precision, but you have to show us where in the record there's a ballpark basis for the damage award, don't you? And, and, and where is that in this record? In this case, Your Honor, we believe clearly and unequivocally receiving the purchase price at a minimum is a clear amount that the jury awarded, including awarding a promissory note that still has not been paid to this date and is still not subject. Not in the record, no one has ever dealt with the promissory note, the district court hasn't. Is the promissory note before us? It is, Your Honor, in our briefs we establish that the promissory note should have accelerated. I know that's your, that's your argument, but did the, did the district court submit that question to the jury? I thought he specifically said not to consider the promissory note. Your Honor, the, the jury, I believe that the instructions with regard to what the jury was to do with the promissory note are, are ambiguous, but under the circumstances. I think the district court specifically told them not to consider the promissory note. I can go back and find it in the record. And the district court did find in its final order that the promissory note was due and payable to triad and it was to be paid when it became due, not accelerated. But, but that's off-subject. The question is the, the award of damages when the jury was, you can't say it included the promissory note because we have to presume that juries follow the judge's instructions and the judge told them expressly not to include it. So with that principle in mind, the jury provided two definitive damage awards, one in favor of the plaintiff for approximately $334,000 and one in favor of the defendant for approximately $332,000. If your Honor says that the plaintiff's damages amount are not clearly discernible, the jury has the same issue, especially in light of the failure to provide a closing date balance sheet with regard to any damages awarded to the defendant. Thank you very much. Thank you. We will come down and greet counsel and proceed directly to the next case. Thank you.
judges: Allyson K. Duncan, Barbara Milano Keenan, Albert Diaz